# UNITED STATE DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

TRIANGLE T PARTNERS, LLC, on behalf of itself and all others similarly situated,

     Plaintiff,

        - against -

BANK OF AMERICA CORPORATION; BANK OF AMERICA, N.A.; MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED; BARCLAYS PLC; BARCLAYS BANK PLC; BARCLAYS CAPITAL INC.; BNP PARIBAS, S.A.; BNP PARIBAS SECURITIES CORP.; CITIGROUP, INC.; CITIBANK, N.A.; CITIGROUP GLOBAL MARKETS INC.; CITIGROUP GLOBAL MARKETS LIMITED; CREDIT SUISSE AG; CREDIT SUISSE GROUP AG; CREDIT SUISSE SECURITIES (USA) LLC; CREDIT SUISSE INTERNATIONAL; DEUTSCHE BANK AG; DEUTSCHE BANK SECURITIES INC.; THE GOLDMAN SACHS GROUP, INC.; GOLDMAN, SACHS & CO.; GOLDMAN SACHS BANK USA; GOLDMAN SACHS FINANCIAL MARKETS, LP; GOLDMAN SACHS INTERNATIONAL; ICAP CAPITAL MARKETS LLC; J.P. MORGAN CHASE & CO.; J.P. MORGAN CHASE BANK, N.A.; J.P. MORGAN SECURITIES LLC; J.P. MORGAN SECURITIES PLC; THE ROYAL BANK OF SCOTLAND GROUP PLC; ROYAL BANK OF SCOTLAND PLC; RBS SECURITIES INC.; TRADEWEB MARKETS LLC; UBS AG; AND UBS SECURITIES LLC,

     Defendants.

---

Civil Action No. 16-5260

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## Table of Contents

OVERVIEW OF THE ACTION ................................................................................................. 4

JURISDICTION AND VENUE ............................................................................................... 9

PARTIES ................................................................................................................................. 11

    A.  Plaintiff................................................................................................................. 11

    B.  Defendants............................................................................................................. 11

DEFENDANTS' CONSPIRACY IN THE INTREST RATE SWAPS MARKET ..................... 19

I.    INTEREST RATE SWAPS AND DEFENDANTS' DOMINANT MARKET POSITION............... 19

    A.  Interest Rate Swaps And How They Are Traded ................................................... 19

    B.  The Dealer Defendants Benefit From Efficient Trading Platforms That Are Not Available To Buy-Side Or Retail IRS Market Participants.................................................................... 21

    C.  The Dealer Defendants Dominate The IRS Market ............................................... 24

        1.  The Dealer Defendants' Substantial Market Power In The IRS Market ......................... 24

        2.  The Dealer Defendants Worked Together To Ensure Their Dominant Position And Power In the IRS Market ............................................................................................ 24

II.  DEFENDANTS CONSPIRED TO PREVENT EXCHANGE-LIKE TRADING TO BECOME WIDELY AVAILABLE TO THE BUY-SIDE PART OF THE IRS MARKET................................ 26

    A.  The IRS Market Was Well Suited For Buy-Side Exchange Trading ...................... 27

    B.  Defendants Used Their Market Power To Deter And Frustrate Emerging Exchanges And Swap Execution Facilities That Would Have Benefited Buy-Side IRS Market Participants.. 29

        1.  The Dealer Defendants Dominated Tradeweb To Ensure That Tradeweb Did Not Introduce An Exchange Platform Available To The Buy-Side IRS Market.................... 29

        2.  The Dealer Defendants Used Their Market Dominance And Control Over Tradeweb To Constrain ICAP From Offering A Buy-Side IRS Exchange Platform............................ 32

        3.  The Dealer Defendants Boycott Javelin ................................................... 34

        4.  The Dealer Defendants Boycott TrueEX .................................................. 35

        5.  The Dealer Defendants Boycott TeraExchange........................................ 36

    C.  The Dealer Defendants Threaten To Cut Off Clearing Services For Buy-Side Firms Who Try To Make Markets On Swap Execution Facilities ................................................................ 38

        1.  The Dealer Defendants Boycott Swapstream ................................................ 41

        2.  The Dealer Defendants Acquire Control Over LCH.Clearnet To Ensure The Clearinghouse Did Not Offer Exchange Trading To The Retail IRS Market.................... 42

    D.  The Dealer Defendants Police The Retail IRS Market Using A Practice Referred To As "Name Give-Up" ............................................................................................................. 45

III. DEFENDANTS' CONSPIRACY HARMED THE INTEREST RATE SWAPS MARKET............. 47

    A.  Defendants' Conspiracy Has Negatively Impacted The Market ............................. 48

B.  Defendants' Conspiracy Has Deterred Introduction Of Exchange-Like Trading For Buy-Side

Participants In The IRS Market ............................................................................................... 49

EQUITABLE TOLLING DUE TO DEFENDANTS' CONCEALMENT .................................................. 51

CLASS ACTION ALLEGATIONS ........................................................................................................ 53

CAUSES OF ACTION ............................................................................................................................ 56

PRAYER FOR RELIEF .......................................................................................................................... 58

JURY DEMAND ..................................................................................................................................... 60

Plaintiff Triangle T Partners, LLC, individually and on behalf of all persons and entities who, during the period of January 1, 2008, through the present, entered into interest rate swaps transactions with Defendants in the United States, brings this antitrust class action for treble damages and injunctive relief and alleges as follows:

## OVERVIEW OF THE ACTION

1.      This case concerns a conspiracy among major banks—the Dealer Defendants[1]— and their co-conspirators to dominate and control the market for interest rate swaps ("IRS"), and reap supracompetitive profits from artificially high spreads for the sale and purchase of IRS.

2.      An IRS is a type of derivative where two parties agree to exchange types of interest payments based on a specified principal amount. Under this arrangement, one party agrees to pay the other a fixed interest rate amount, while the other party agrees to pay a floating interest rate (usually based on the London interbank offered rate). Over time, IRS agreements became highly standardized, where all the material terms are set, which, in turn, led to a higher volume of IRS trading and large growth in the IRS market.

3.      A wide array of investors engage in IRS trading, including, among others, the Plaintiff, pension funds, university endowment funds, corporations, insurance companies, and municipalities (*i.e.*, members of the proposed class here). Investors use IRS as a tool to hedge against fluctuations in interest rates, or to speculate as to movements in interest rates. IRS comprise one of the largest financial markets with billions of dollars in swaps being traded each day.

4.      Like other derivatives, IRS trading involves dealers, including the Defendant Dealers, who act as market makers. The primary term that is negotiated with an IRS trade is the

---

[1] As defined more fully below, the Dealer Defendants are Bank of America, Barclays, BNPP, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, JP Morgan, RBS and UBS.

fixed rate interest amount. The rate at which a dealer will pay the fixed interest amount is known as the "bid" price, and the rate at which the dealer will receive the fixed rate amount is known as the "offer" or the "ask" price. The Dealer Defendants profit based on the difference between the bid and ask prices, which is known as the "spread." Dealers are generally referred to as the "sell-side" (or "wholesale" side) of the IRS market, and investors are generally referred to as "end-users" or the "buy-side" (or "retail" side) of the market.

5.      The structure of the IRS market is characterized by two distinct forms of trading: dealer-to-client and dealer-to-dealer. When dealers are trading among themselves, they use trading platforms known as "IDBs" (a shorthand reference to "interdealer brokers"). IDB platforms are exchange-like platforms that offer efficient and anonymous trading for dealers. They provide dealers with numerous quotes for IRS that may be viewed simultaneously. Dealers can choose to enter into IRS trades immediately or even query via the IDB platform whether a better price can be negotiated, a practice referred to as "tightening up" the price. Dealers trading on an IDB platform may do so anonymously up to the point where the IRS trade is finalized and executed. IDB platforms also employ features that automatically match the best bids and offers on an anonymous basis, which are referred to as "order books" or "central limit order books" (or "CLOBs"). As a result, dealers, including the Defendant Dealers, tend to trade IRS at or close to mid-market prices (*i.e.*, with very small spreads).

6.      Buy-side IRS traders, including Plaintiff and the other members of the class, however, must use Request for Quote (or "RFQ") trading platforms. A buy-side participant uses an RFQ to request quotes from several dealers at once. These quotes are not available for immediate execution. Instead, the user must contact the dealer directly, usually via the phone or something like Bloomberg chat, in order to obtain the final price and then execute the trade, if

desired. This process is highly inefficient. Because the prices listed on these platforms are not the "live" price (*i.e.*, the price at which the dealer will trade), buy-side participants do not benefit from price transparency, akin to pricing on the IDB platforms, which, in turn, produces little or no competitive pricing and increased spreads in the retail IRS market. Indeed, the RFQ platform trading is functionally the same as the antiquated over-the-counter (or "OTC") trading process, where end-users were required to contact dealers directly to obtain price quotes that were generally offered on a take-it-or-leave-it basis.

7. Through their conspiracy, Defendants worked in concert to maintain this bifurcated structure of the IRS market. Since at least 2007, as detailed herein, the Dealer Defendants have jointly threatened, boycotted, coerced and otherwise eliminated any entity or practice that had the potential to bring exchange-like trading to buy-side investors in the IRS market.

8. For example, following the sale of co-Defendant Tradeweb Markets LLC ("Tradeweb") to Thomson Reuters, the Dealer Defendants acted to acquire a minority interest in Tradeweb in order to exert control over its operations. At the time, Tradeweb was moving toward offering an on-line, real-time, exchange-like platform usable by buy-side participants in the IRS market. Through the exercise of their control over Tradeweb, the Dealer Defendants ensured that Tradeweb continued to offer only an RFQ platform to buy-side participants that did not provide real-time, exchange-like features.

9. Similarly, the Dealer Defendants leveraged their control over Tradeweb to reach an arrangement with co-Defendant ICAP Capital Markets LLC ("ICAP"), where these parties agreed that ICAP would not introduce its i-Swap IRS trading platform, which was an exchange-like platform that could be made available to buy-side IRS participants. ICAP provided the i-

Swap platform to all users in the European market, but, consistent with its agreement with the other Defendants, when it introduced the platform in the United States IRS market, i-Swap was limited to participation by dealers.

10.    When, in 2010, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act"), it required that IRS trading use Swap Exchange Facilities (or "SEFs"), which are exchange-like platforms. In light of the standardization of IRS agreements, this mandate promised to promote and introduce exchange-like platforms to the retail IRS market.

11.    The Dealer Defendants, however, conspired to frustrate or boycott any entity that considered or introduced a SEF providing exchange-like features to buy-side users. Among the targeted enterprises that sought to provide buy-side participants with "all-to-all," anonymous exchange-like trading platforms were Javelin, TrueEX and TeraExchange. Through their conspiracy, the Dealer Defendants acted to starve these entities of the liquidity necessary to successfully operate an IRS trading platform by, among other things, refusing to allow their IRS products to be available for trading on these platforms.

12.    As a result of the Dealer Defendants' collusive conduct, few if any SEFs dared to offer an exchange-like platform to retail IRS participants. Instead, SEFs provide buy-side participants with RFQ trading platforms, thereby maintaining the bifurcated market structure favored by Defendants.

13.    Defendants' conspiracy also impacted the operation of clearinghouses that process IRS trades. A clearinghouse is a well-known feature of modern derivatives trading that helps to facilitate trades and reduce the risk of default by one of the trading parties. Given their

important and central role in IRS trading, a clearinghouse entity could easily develop or offer an exchange-like trading platform usable by the IRS retail market.

14.      Defendants conspired to prevent any clearinghouse from integrating with its clearing services an exchange-like platform available to buy-side users. The Dealer Defendants achieved this goal by boycotting exchanges developing a retail exchange-like platform, as they did with Swapstream, or by obtaining a controlling interest in the clearinghouse to steer it away from developing such a platform, as they did with LCH.Clearnet.

15.      Defendants' conspiracy also utilized a policing mechanism, known as "name give-up," that allowed the conspirators to identify and then retaliate against conduct by retail IRS participants that threatened the Dealer Defendants' ability to impose supracompetitive prices for IRS. The term "name give-up" refers to the practice of requiring that the name of each counterparty to an IRS trade be made known to the other counterparty. By identifying trade counterparties in this manner, the Dealer Defendants know when a buy-side participant is attempting to trade IRS on a dealer-only platform. This allows Defendants to retaliate against the buy-side user, or even the trading platform, in order to ensure that no retail market participant can take advantage of the more favorably priced dealer-to-dealer trading platforms.

16.      The name give-up mechanism does not otherwise serve any useful purpose in the IRS market. Indeed, beyond allowing Defendants to police trading activities, this practice also tends to divulge buy-side participants' trading strategies, which knowledge can be exploited by dealers to the detriment of buy-side traders' interests.

17.      In addition to the name give-up mechanism, the Dealer Defendants engage in other practices that help to maintain their dominant and controlling position in the IRS market. For example, the Dealer Defendants may impose punitively high clearing fees and/or threaten to

cut off clearing and other services for any buy-side participant that Defendants believe is acting in a manner that threatens their ability to continue to charge artificially high bid/ask spreads for IRS.

18.    Absent Defendants' collusive conduct, as described herein, the IRS market would have naturally developed exchange-like trading platforms accessible by buy-side participants, who could then enjoy the full benefits of real-time, all-to-all, anonymous trading, akin to the advantages the Dealer Defendants enjoy with dealer-to-dealer trading platforms. Given the standardization of IRS and the high volume of IRS trading, the IRS market is well-suited for exchange-like trading available to all market participants. All market participants would then enjoy the transparency, competitive pricing and immediacy that such exchanges offer, in turn, leading to reduced bid/ask spreads for buy-side IRS participants.

19.    As a result of Defendants' collusion, the IRS market does not offer exchange-like trading platforms to buy-side participants. Instead, Defendants' collusion has caused the IRS market to retain a bifurcated structure where the retail market uses dealer-to-client platforms that lack the transparency and competitive advantages of the dealer-to-dealer platforms used by the wholesale-side of the market. Defendants' collusive conduct has enabled them to maintain this bifurcated market structure, in turn, allowing the Dealer Defendants to impose supracompetitive prices for IRS trades.

## JURISDICTION AND VENUE

20.    Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries to Plaintiff and the Class, alleged herein, arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

21.    This Court has subject matter jurisdiction over this action pursuant Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, as well as pursuant to 28 U.S.C. §§ 1331 and 1337(a).

22.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, as well as pursuant to 28 U.S.C. § 1391(b), (c), and (d), because during the relevant period all the Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein was carried out in this District.

23.    Defendants' activities, and those of their co-conspirators, were within the flow of, were intended to, and had a substantial effect on interstate commerce.

24.    Pursuant to the nationwide contacts test provided for by 15 U.S.C. § 22, many Defendants are subject to personal jurisdiction in the United States because they, as set forth below, were formed in or have their principal places of business in the United States. In addition, all members of the conspiracy are subject to personal jurisdiction in the United States because the conspiracy was directed at, carried out in substantial part in, and had the intended effect of, causing injury to Plaintiff and the members of the Class residing in, located in, or doing business throughout the United States.

25.    The Dealer Defendants are also subject to personal jurisdiction here because they each transacted business throughout the United States, including in this District, that was directly related to the claims at issue in this action. The IRS at issue in this action—which often include a contractual clause submitting the parties to jurisdiction in this District—were regularly traded through desks at the major sell-side banks located in New York.

# PARTIES

### A.    **Plaintiff**

26.    Triangle T Partners, LLC is a limited liability company located in Chowchilla, California. During the Class Period (as defined at ¶ 202 *infra*), Triangle T Partners assumed Interest Rate Swaps that were entered into with Defendant Bank of America during the Class Period and was injured thereby.

### B.  **Defendants**

27.    Whenever reference is made to any act, deed, or transaction of any entity, the allegation means that the corporation engaged in the act, deed, or transaction by or through its subsidiaries, affiliates, officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the entity's business or affairs.

28.    Defendant Bank of America Corporation ("BAC") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Charlotte, North Carolina. Defendant Bank of America, N.A. ("BofA") is a federally chartered national banking association with its principal place of business in Charlotte, North Carolina, and branch locations in New York, New York. BofA is a wholly owned subsidiary of BAC. On January 1, 2009, Bank of America acquired Merrill Lynch & Co., Inc. Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York. MLPFS is a wholly owned subsidiary of BAC. In addition, MLPFS is registered as a broker-dealer with the U.S. Securities and Exchange Commission ("SEC"), and as a Futures Commission Merchant ("FCM") with the Commodity Futures Trading Commission ("CFTC").

29.     As used herein, the term "Bank of America" includes Defendants BAC, BofA, MLPFS, and their subsidiaries and affiliates, including Merrill Lynch & Co. and Merrill Lynch Bank USA, that entered into IRS contracts with the Class, including as a dealer. During the Class Period, Bank of America directly sold IRS to and bought IRS from members of the Class. During the Class Period, Bank of America was a shareholder of Tradeweb (as defined below).

30.     Defendant Barclays PLC is a corporation organized and existing under the laws of England and Wales, with its principal place of business in London, England. Defendant Barclays Bank PLC is a corporation organized and existing under the laws of England and Wales, with its principal place of business in London, England and branch locations in New York, New York. Defendant Barclays Capital Inc. is a corporation organized and existing under the laws of the State of Connecticut, with its principal place of business in New York, New York, and is a wholly owned subsidiary of Barclays Group US Inc., which in turn is a wholly owned subsidiary of Barclays Bank PLC. In addition, Barclays Capital Inc. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

31.     As used herein, the term "Barclays" includes Defendants Barclays PLC, Barclays Bank PLC, Barclays Capital Inc., and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer. Barclays Bank PLC maintains a New York branch. Barclays transacts business in New York, New York. During the Class Period, Barclays directly sold IRS to and bought IRS from members of the Class. During the Class Period, Barclays was a shareholder of Tradeweb.

32.     Defendant BNP Paribas, S.A. ("BNPP SA") is a corporation organized and existing under the laws of the France, with its principal place of business in Paris, France and branch locations in the United States, including its New York, New York branch. Defendant

BNP Paribas Securities Corp. ("BNPP Securities") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York, and is a wholly owned subsidiary of BNP Paribas North America, Inc., the ultimate parent of which is BNPP SA. In addition, BNPP Securities is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

33.     As used herein, the term "BNPP" includes Defendant BNPP SA, BNPP Securities, and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer. BNPP transacts business in New York, New York. During the Class Period, BNPP directly sold IRS to and bought IRS from members of the Class.

34.     Defendant Citigroup, Inc. ("Citigroup") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. Defendant Citibank N.A. ("Citibank") is a federally chartered national banking association with its principal place of business in New York, New York, and is a wholly owned subsidiary of Citigroup. Defendant Citigroup Global Markets Inc. is a corporation organized and existing under the laws of the State of New York, with its principal place of business in New York, New York, and is a wholly owned subsidiary of Citigroup Financial Products Inc., whose ultimate parent is Citigroup. In addition, Citigroup Global Markets Inc. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC. Defendant Citigroup Global Markets Limited is a corporation organized and existing under the laws of England and Wales, with its principal place of business in London, England.

35.     As used herein, the term "Citi" includes Defendants Citigroup, Citibank, Citigroup Global Markets Inc., Citigroup Global Markets Limited, Citigroup Global Markets Inc., and their subsidiaries and affiliates, including but not limited to Citigroup Energy Inc., that

entered into IRS contracts with the Class, including as a dealer. During the Class Period, Citi directly sold IRS to and bought IRS from members of the Class. During the Class Period, Citi was a shareholder of Tradeweb.

36.     Defendant Credit Suisse Group AG is a corporation organized and existing under the laws of Switzerland with its principal place of business in Zurich, Switzerland. Defendant Credit Suisse AG is a bank organized and existing under the laws of Switzerland with its principal place of business in Zurich, Switzerland, and it maintains a New York, New York branch. Defendant Credit Suisse International is a bank organized and existing under the laws of England and Wales, with its principal place of business in London, England. Defendant Credit Suisse Securities (USA) LLC is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York, and is a wholly owned subsidiary of Credit Suisse (USA), Inc., whose ultimate parent is Credit Suisse Group AG. In addition, Credit Suisse Securities (USA) LLC is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

37.     As used herein, the term "Credit Suisse" includes Defendants Credit Suisse Group AG, Credit Suisse AG, Credit Suisse International, Credit Suisse Securities (USA) LLC, and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer. Credit Suisse transacts business in New York, New York. During the Class Period, Credit Suisse directly sold IRS to and bought IRS from members of the Class. During the Class Period, Credit Suisse was a shareholder of Tradeweb.

38.     Defendant Deutsche Bank AG is a corporation organized and existing under the laws of Germany with its principal place of business in Frankfurt, Germany. Defendant Deutsche Bank Securities Inc. is a corporation organized and existing under the laws of the State of

Delaware, with its principal place of business in New York, New York, and is a wholly owned subsidiary of DB U.S. Financial Markets Holding Corporation, whose ultimate parent is Deutsche Bank AG. In addition, Deutsche Bank Securities Inc. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

39. As used herein, the term "Deutsche Bank" includes Defendant Deutsche Bank AG, Deutsche Bank Securities Inc., and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer. During the Class Period, Deutsche Bank directly sold IRS to and bought IRS from members of the Class. Deutsche Bank transacts business in New York, New York, and maintains a New York branch. During the Class Period, Deutsche Bank was a shareholder of Tradeweb.

40. Defendant The Goldman Sachs Group, Inc. ("Goldman Sachs Group") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. Defendant Goldman Sachs & Co. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. In addition, Goldman Sachs & Co. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC. Defendant Goldman Sachs Bank USA is a New York state-chartered bank and a member of the Federal Reserve's system, with its principal place of business in New York, New York, and is a wholly owned subsidiary of Goldman Sachs Group. Defendant Goldman Sachs Financial Markets, L.P. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York, and is a wholly owned subsidiary of Goldman Sachs Group. Defendant Goldman Sachs International is a bank organized and existing under the laws of England and

Wales, with its principal place of business in London, England, and is a wholly owned subsidiary of Goldman Sachs Group.

41.    As used herein, the term "Goldman Sachs" includes Defendants Goldman Sachs Group, Goldman Sachs & Co., Goldman Sachs Bank USA, Goldman Sachs Financial Markets, L.P., Goldman Sachs International, and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer. During the Class Period, Goldman Sachs directly sold IRS to and bought IRS from members of the Class. During the Class Period, Goldman Sachs was a shareholder of Tradeweb.

42.    Defendant J.P. Morgan Chase & Co. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. Defendant J.P. Morgan Chase Bank, N.A. is a federally chartered national banking association with its principal place of business in New York, New York. Defendant J.P. Morgan Securities LLC (also known as "J.P. Morgan Securities Inc.") is a corporation organized and existing under the laws of Delaware, with its principal place of business in New York, New York, and is a wholly owned subsidiary of J.P. Morgan Securities Holdings LLC, which in turn is a subsidiary of JPMorgan Chase & Co. In addition, J.P. Morgan Securities LLC is registered as a broker-dealer with the SEC, and as an FCM with the CFTC. Defendant J.P. Morgan Securities Plc is a corporation organized and existing under the laws of the United Kingdom, with its principal place of business in London, England, and it is a wholly owned subsidiary of J.P. Morgan Chase & Co.

43.    As used herein, the term "JP Morgan" includes Defendants J.P. Morgan Chase & Co.; J.P. Morgan Chase Bank, N.A.; J.P. Morgan Securities LLC; J.P. Morgan Securities Plc; and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a

dealer. During the Class Period, JP Morgan directly sold IRS to and bought IRS from members of the Class. During the Class Period, JP Morgan was a shareholder of Tradeweb.

44.     Defendant Royal Bank of Scotland PLC ("RBS PLC") is the primary operating bank of Defendant The Royal Bank of Scotland Group PLC ("RBS Group PLC"), a corporation organized and existing under the laws of England and Wales with its principal place of business in Edinburgh, Scotland and regional offices in New York, New York and Stamford, Connecticut. Defendant RBS Securities Inc. is a corporation organized and existing under the laws of Delaware, with its principal place of business in Stamford, Connecticut, and is a wholly owned subsidiary of RBS PLC. In addition, RBS Securities Inc. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

45.     As used herein, the term "RBS" includes Defendants RBS PLC, RBS Group PLC, RBS Securities Inc., and their subsidiaries and affiliates that entered into IRS contracts with the Class, including as a dealer. RBS PLC maintains a New York branch. RBS transacts business in New York, New York. During the Class Period, RBS directly sold IRS to and bought IRS from members of the Class. During the Class Period, RBS was a shareholder of Tradeweb.

46.     Defendant UBS AG ("UBS AG") is a corporation organized and existing under the laws of Switzerland with its principal places of business in Basel and Zurich, Switzerland and regional offices in New York, New York and Stamford, Connecticut. Defendant UBS Securities LLC is a corporation organized and existing under the laws of Delaware, with its principal place of business in New York, New York, and is an indirect wholly owned subsidiary of UBS AG. In addition, UBS Securities LLC is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

47.     As used herein, the term "UBS" includes Defendant UBS AG, UBS Securities

LLC, and their subsidiaries and affiliates that entered into IRS contracts with the Class, including

as a dealer. UBS maintains a New York branch and transacts business in New York, New York.

During the Class Period, UBS directly sold IRS to and bought IRS from members of the Class.

During the Class Period, UBS was a shareholder of Tradeweb.

48.     Defendant ICAP Capital Markets LLC is a corporation organized and existing

under the laws of the State of Delaware, with its principal place of business in Jersey City, New

Jersey. As used herein, the term "ICAP" includes Defendant ICAP Capital Markets LLC and its

subsidiaries and affiliates that acted as brokers for a wide range of asset classes, including IRS,

the foreign exchange market, commodities, credit default swaps ("CDS"), and various equities.

In the IRS market, ICAP acts as an IDB, brokering IRS trades between dealers. As explained

below, ICAP agreed with the Dealer Defendants that it would not allow its platform to be

accessed by the buy-side of the IRS market.

49.     Defendant Tradeweb Markets LLC ("Tradeweb Markets") is a corporation

organized and existing under the laws of the State of Delaware, with its principal place of

business in New York, New York. As used herein, the term "Tradeweb" includes Tradeweb

Markets and its subsidiaries and affiliates that acted as providers of trading services for IRS,

CDS, and other asset classes. Tradeweb's historical focus has been on providing electronic

trading services in the dealer-to-client side of the market. Tradeweb is jointly owned by

Thomson Reuters and a consortium of Wall Street Dealers (the Dealer Defendants other than

BNPP). The Dealer Defendants exercise control over Tradeweb. As explained below, at all times

relevant to the allegations set forth herein, the Dealer Defendants took control of Tradeweb to

prevent it from developing an all-to-all, exchange-like platform for IRS that would collapse the

artificial bifurcation the Dealer Defendants have collectively imposed, and further used their joint control of it as a pretext to coordinate other acts of the conspiracy.

## DEFENDANTS' CONSPIRACY IN THE INTREST RATE SWAPS MARKET

### I. INTEREST RATE SWAPS AND DEFENDANTS' DOMINANT MARKET POSITION

#### A. Interest Rate Swaps And How They Are Traded

50.    An IRS is an agreement between two parties where one party agrees to make payments to the second party based on a fixed interest rate applied to a specified principal (or "notional") amount, while the second party agrees to make payments to the first party based on a floating interest rate also applied to the same specified principal amount. The floating rate is usually based on the London interbank offered rate ("LIBOR"). The principal amount itself is not actually exchanged between the contracting parties, usually referred to as counterparties; instead, only the difference between the fixed and variable interest amounts is paid. An IRS is a mechanism that essentially converts one interest rate to another, *e.g.*, a floating or variable interest rate to a fixed interest rate, or vice versa. These types of IRS are often described as "plain vanilla swaps," and they are the most common form of IRS. By convention, in the context of a plain vanilla swap, the fixed rate payer is typically referred to as the "buyer," while the floating rate payer is known as the "seller."

51.    An IRS is a type of derivative where the counterparties can use the agreement to either hedge against possible fluctuations in long-term interest rates or as a way to speculate on changes in interest rates. IRS, however, are a "zero sum" game: what one counterparty receives as a benefit from the IRS, the other counterparty loses (*i.e.*, one party will earn a profit at the end of the agreement and the other party will lose that amount).

52.     The IRS market is delineated by two main groups: a "sell-side" and a "buy-side."
Dealers, including the Dealer Defendants, act as market makers, continually offering prices to both
potential buyers and sellers of IRS. They are referred to as the "sell-side" (or "wholesale" side) of
the market. The end users in the market, including Plaintiff and the Class here, buy and sell IRS.
The end users have become known as the "buy-side" (or "retail" side), and these two terms are
often used interchangeably in the marketplace. The sell-side markets IRS by offering both fixed
and floating-rate cash flows to the buy-side participants, who receive prices quoted by the market-
making dealers.

53.     The mechanics of an IRS trade are fairly straightforward: A buy-side entity
approaches a dealer for a quote to pay one of the interest rates, fixed or floating, and to receive
the other. The fixed rate amount is the primary term that is subject to negotiation when entering
into an IRS trade. The rate at which the dealer will pay the fixed rate is known as the "bid" price,
and the rate at which it will receive the fixed rate is known as the "offer" or the "ask" price. The
duration (or "maturity" or "tenor") of an IRS is typically denominated in years, *e.g.*, one year or
five years, etc. As an example, a five-year IRS may be quoted by a dealer at a bid of 25 basis-
points above the five-year U.S. Treasury yield for the fixed rate payments, or an ask of 30 basis-
points above the five-year U.S. Treasury yield for the fixed rate payments. The difference
between the amount of the bid and ask prices is referred to as the "spread." The floating rate in
either case is typically based on LIBOR or another benchmark rate.

54.     The Dealer Defendants profit based on the spread, *i.e.*, by paying low on the fixed
rate bid price and receiving a higher fixed rate for the ask or offer price. The wider the spread,
the greater the profits for the Dealer Defendants. The mid-point of the spread is generally
referred to as the mid-market price.

55.    Initially, IRS trading was handled on an *ad hoc* basis where dealers did not make markets in IRS. The IRS agreements themselves were not standardized, requiring negotiations over a variety of terms for each trade, in turn introducing high transaction costs for IRS trades.

56.    By no later than 2000, IRS had become highly standardized. A driving force in this standardization was the 1987 ISDA Master Agreement, which created standard form agreements for IRS. The ISDA Master Agreement was significantly revised and updated in 1992 and 2002. These agreements standardized all of the material terms of IRS, including the tenor, the benchmark rates used to calculate floating payments, and the timing of payments. This standardization reduced transaction costs, which led to higher volumes of IRS trading.

57.    The ease with which IRS can be used to either hedge or speculate as to movements in interest rates has made these derivatives increasingly more popular, and they are used by a variety of corporations and financial institutions. The IRS market has grown exponentially over the last three decades.

58.    By way of example, in 2006 the outstanding notional value of IRS was $230 trillion. By 2014, that amount had increased to $381 trillion, representing 75% of all types of interest-rate derivatives. In April 2013, the IRS market saw approximately $1.4 trillion of notional value turn over on a daily basis. While IRS are traded in many currencies, the majority (roughly two-thirds) of all IRS trades are in U.S. dollars and the euro.

B.    **The Dealer Defendants Benefit From Efficient Trading Platforms That Are Not Available To Buy-Side Or Retail IRS Market Participants**

59.    Trading in IRS was initially handled as an "over-the-counter" (or "OTC") market. In this system, dealers serve as the primary market makers, quoting prices at which they will buy (the "bid") or sell (the "offer" or "ask") to buy-side participants or other dealers. Trading is not

centralized, and dealers typically convey their "take-it-or-leave-it" quotes. Most transactions were managed via phone calls or using something like the Bloomberg chat service.

60.    To "shop" for an IRS trade, a buy-side participant needed to contact numerous market-making dealers to obtain prices for a possible trade. This approach was fraught with risks and inefficiencies as the buy-side participant could not know how long a market-maker dealer's price would remain open and executable, and the buy-side participant could realistically only contact a limited number of such dealers before deciding whether to enter into the trade. This prominent feature of OTC trading makes it difficult, if not impossible, to have price transparency in the buy-side IRS market, thereby encouraging little or no competitive pricing among market-maker dealers.

61.    More recently, trading in IRS has shifted to Request for Quote (or "RFQ") platforms. These platforms operate in a manner similar to OTC trading described above. On an RFQ, the buy-side participant can request quotes from several dealers at once. These quotes, however, are not available for immediate execution (*i.e.*, they are not 'live" quotes), but rather the buy-side participant must contact the dealer to obtain a live price and complete the trade. The RFQ platform is the functional equivalent to OTC trading.

62.    Dealers, including the Dealer Defendants, use a different platform to trade amongst themselves. The platforms the dealers use are known as "IDBs," which is a shorthand reference to "interdealer brokers" and the platforms that are used for their trades.

63.    The OTC and RFQ aspect of the IRS market is generally referred to as the "retail" side of the market, and the dealer-only IDB aspect of the IRS market is generally referred to as the "wholesale" side of the market.

64.     Dealers who wish to trade IRS with other dealers may use an IDB platform to submit their bid and ask prices for IRS. The IDB platform publicizes these quotes, which are viewable to and executable by other dealers. A dealer using an IDB can view multiple quotes simultaneously and, if desired, act immediately to enter into an IRS trade at the quoted price presented on the IDB. The dealer can also use the IDB platform to negotiate a better price for the desired trade, which process is commonly referred to as "tightening up" the price. Dealers trading on an IDB do so anonymously, without their identities revealed to the other counterparty until such time that the trade is finalized.

65.     With the advent of standardized IRS agreements, the IDBs utilized exchange-like platforms known as "order books" or "central limit order books" (the latter term often referenced simply as "CLOBs"), which automatically match the best bids and offers on an anonymous basis. Unlike the OTC/RFQ retail IRS market, dealers enjoy price transparency in the dealer-to-dealer market because IDB platforms allow dealers to view and choose from numerous bid and offer prices at one time. As a result, dealers using IDB can trade with each other at or close to mid-market prices.

66.     Put differently, a centralized electronic platform used in the wholesale side of the market where trading is anonymous, such as with a CLOB on an IDB platform, leads to narrower bid/ask pricing than that found with the OTC/RFQ trading used on the retail side of the IRS market.

67.      Following the development of standardized IRS agreements and with the increased liquidity in IRS trading due to the increasing volume of trades, the IRS market should have moved to trading on exchange-like CLOB platforms on both the retail and wholesale sides of the market. As discussed in greater detail below, Defendants conspired to prevent the wide use

of exchange-like platforms in the retail IRS market by, *inter alia*, limiting buy-side participants to OTC/RFQ trading.  The Dealer Defendants benefit from the pricing opacity and lack of competition inherent in OTC/RFQ trading systems, thereby allowing them to extract wider bid/ask spreads (*i.e.*, supra-competitive profits) from the buy-side.

### C.     The Dealer Defendants Dominate The IRS Market

#### 1.     The Dealer Defendants' Substantial Market Power In The IRS Market

68.     The Dealer Defendants account for the majority of IRS trading from which they earn extraordinary profits from their retail IRS trades. As a result of the conspiracy, it is virtually impossible for Plaintiff and the members of the Class to trade directly with another buy-side participant in the IRS market.

69.     The Dealer Defendants collectively dominate the IRS market as each Dealer Defendant individually controls a significant share of the IRS market. By way of example, in 2014, five of the ten Dealer Defendants collectively controlled over 50% of the IRS market, while the remaining five Dealer Defendants controlled at least an additional 20% of the IRS market. Indeed, the available market share data indicate that the Dealer Defendants collectively controlled at least 70% of the market.

70.      The Dealer Defendants' substantial market power makes them indispensable in the retail (OTC/RFQ) market for IRS. In turn, the Dealer Defendants can use their massive market power to ensure that the structural mechanics of the OTC/RFQ market work to their benefit.

#### 2.     The Dealer Defendants Worked Together To Ensure Their Dominant Position And Power In The IRS Market

71.     Defendants worked together to maintain their control of the IRS market, in particular, the retail side of the market.

72.     A number of the Dealer Defendants, including Goldman Sachs, JP Morgan and Credit Suisse, organized internal teams or groups that were tasked with developing strategies for their respective dealer to benefit from the IRS market. Personnel who staffed these internal strategy teams communicated about the IRS market with their counterparts at other Dealer Defendants.

73.     For example, Goldman Sachs created an internal strategy team called the Principal Strategic Investments Group ("PSI"). This group promoted a "consortium" strategy where Goldman Sachs would participate in dealer consortiums to invest in technologies and trading firms. This consortium approach offered Goldman Sachs (and, by logical extension, its consortium partners) a mechanism to control or profit from support activities that improved Goldman Sachs' trading activities.

74.     Personnel from these internal Defendant Dealer strategy groups often take positions with other firms that own and control important aspects of the IRS market infrastructure. For example, Vic Simone, a Managing Director at Goldman Sachs and the former head of Goldman Sachs' PSI Group, has served as the Chairman of the Board of Directors of Tradeweb, which operates an electronic OTC marketplace for IRS trading. As discussed in more detail below (*see* Part II.B.1), this move was part of a process where the Dealer Defendants obtained control over Tradeweb to eliminate a potential threat to how they manage and offer OTC/RFQ trading to the buy-side of the IRS market. Mr. Simone was succeeded in that role by Brad Levy, who had become the head of Goldman Sachs' PSI group. Mr. Levy is currently the CEO of MarkitSERV, which provides trade processing services related to IRS. Another member of Tradeweb's management is Simon Maisey, a former JP Morgan employee whose responsibilities included IRS trading.

75.     The Dealer Defendants also dominate the board of the International Swaps and Derivatives Association ("ISDA"). ISDA is an industry group whose mission statement is to foster safe and efficient derivative markets. The Dealer Defendants, however, have controlled ISDA's board from 2008 to the present. This control provides the Dealer Defendants with an opportunity to discuss the IRS market and maintain their conspiracy to control that market.

76.     The following Dealer Defendant personnel currently hold positions on the ISDA board of directors: Keith Bailey (Barclays: Secretary), Diane Genova (JP Morgan: Treasurer), Biswarup Chatterjee (Citigroup: Director), John Dabbs (Credit Suisse: Director), Kieran Higgins (RBS: Director), Christopher Murphy (UBS: Director), and Will Roberts (Bank of America: Director).

77.     Each of the above examples—use of consortia, a "revolving door" transfer of personnel from the Dealer Defendants to entities that operate key elements of the IRS market, and control of important trade organizations, like ISDA—illustrate how Defendants worked together to implement and maintain their conspiracy to control the buy-side IRS market and reap supracompetitive profits.

## II.    DEFENDANTS CONSPIRED TO PREVENT EXCHANGE-LIKE TRADING TO BECOME WIDELY AVAILABLE TO THE BUY-SIDE PART OF THE IRS MARKET

78.     As discussed above, the Dealer Defendants enjoy the benefits of efficient, anonymous trading using on electronic IDB platform, whereas Plaintiff and the members of the Class are relegated to OTC/RFQ trading mechanisms. There is no pro-competitive justification for maintaining such separate trading mechanisms, particularly where the dealer market-makers are able to trade in a competitive manner that reduces spreads closer to the mid-market price.

79.     Absent the conspiracy alleged herein, the retail side of the IRS market would also enjoy access to efficient electronic trading systems such that Plaintiff and the members of the Class would have received better prices (*i.e.*, smaller spreads). Indeed, the introduction and use of anonymous, "all-to-all" electronic trading platforms, *i.e.*, an exchange-like trading platform as discussed below, would have offered buy-side market participants the opportunity to trade directly with each other.

A.     **The IRS Market Was Well Suited For Buy-Side Exchange Trading**

80.     By the mid-2000s, participants in the IRS market, including regulators and economists, recognized that the introduction of central clearing and exchange trading platforms could bring benefits to all participants in the IRS market through increased transparency in trades, which would promote increased competition on IRS pricing. This shift was possible, in part, due to the standardization of IRS agreements and the ever growing volume of IRS trades.

81.     In 2010, Congress passed the Dodd-Frank Act, 12 U.S.C. § 5301 (2010), that brought important changes to derivatives markets, including the IRS market. The Dodd-Frank Act mandated that IRS be traded on exchanges, which were referred to as Swap Execution Facilities or "SEFs," 15 U.S.C. § 78c-3(h). A SEF is defined as

> a trading system or platform in which multiple participants have the ability to execute or trade swaps by accepting bids and offers made by multiple participants in the facility or system, through any means of interstate commerce, including any trading facility, that—(A) facilitates the execution of swaps between persons; and (B) is not a designated contract market. 7 U.S.C. § 1a(50).

82.     The purpose of the SEF mandate, therefore, was to foster competition and transparency for IRS trading. As the Commodity Futures Trading Commission ("CFTC") explained:

> It is generally accepted that when markets are open and transparent, prices are more competitive and markets are more efficient. The legislative history of the Dodd-Frank Act indicates that Congress viewed exchange trading as a mechanism to

27

"provide pre- and trade transparency for end users, market participants, and regulators." As such, exchange trading was intended as "a price transparency mechanism" that complements Title VII's separate central clearing requirement to mitigate counterparty risk. Additionally, *legislative history reveals a Congressional expectation that, over time, exchange trading of swaps would reduce transaction costs, enhance market efficiency, and counter the ability of dealers to extract economic rents from higher bid/ask spreads at the expense of other market participants*. Core Principles and Other Requirements for Swap Execution Facilities, 78 Fed. Reg. 33,476, 33, 553-54 (June 4, 2013) (codified at 17 C.F.R. Part 27) (emphasis added).

83.    The Dealer Defendants, however, conspired to extract supracompetitive prices (via higher bid/ask spreads) at the expense of other market participants. Defendants worked together to prevent exchange platforms and SEFs from introducing greater competition and transparency to the market. Rather, Defendants conspired to ensure that SEFs continued to replicate the OTC/RFQ type of trading that provided the Dealer Defendants with the ability to impose higher bid/ask spreads and reap supracompetitive profits.

84.    The following sections describe some of the machinations employed by Defendants to frustrate or eliminate the threat of exchange trading and SEFs. This conduct is organized in three general categories: (i) Defendants' efforts to deter and frustrate any emerging exchanges or SEFs; (ii) Defendants' threats to cut off clearing services to buy-side participants; and (iii) Defendants' policing the IRS market by imposing "name give-up" requirements that negated efforts of buy-side participants to trade anonymously in the IRS market.

85.    Defendants' concerted efforts have allowed the Dealer Defendants to maintain the two-tier market structure of "dealer-to-dealer" (wholesale) and "dealer-to-client" (retail) that enables the Dealer Defendants to impose higher spreads on the retail (buy-side) market.

B.    **Defendants Used Their Market Power To Deter And Frustrate Emerging Exchanges And Swap Execution Facilities That Would Have Benefited Buy-Side IRS Market Participants**

86.    Defendants' concerted conduct to deter, frustrate or eliminate exchanges and SEFs that posed a threat to their dominance over the retail IRS market involved efforts to either control or dominate entities that could develop an exchange-like IRS trading system, or to boycott such entities. Examples of this conduct include the Dealer Defendants' exercise of control over co-Defendant Tradeweb, the use of their market dominance and control over Tradeweb to constrain co-Defendant ICAP from offering a buy-side IRS exchange platform, and the boycotting of three emerging IRS SEFs (Javelin, TrueEX and TeraExchange).

1.    **The Dealer Defendants Dominated Tradeweb To Ensure That Tradeweb Did Not Introduce An Exchange Platform Available To The Buy-Side IRS Market**

87.    The Dealer Defendants acted in concert to obtain and exert control over Tradeweb at a time when Tradeweb could have offered buy-side participants in the IRS market an exchange that provided anonymous, real-time IRS trading.

88.    Thomson Reuters acquired Tradeweb in 2004. Prior to that acquisition, Tradeweb was owned by a collection of private dealer-backed firms, including Dealer Defendants Credit Suisse, Citi, Goldman Sachs, Merrill Lynch, JP Morgan and Deutsche Bank. The company sought to provide an online market for fixed-income products, such as U.S. Treasuries.

89.    Among its services, Tradeweb provided an RFQ platform for buy-side IRS trading. This platform did not offer anonymous trading, and the retail sales of IRS still required a buyer to request non-executable and non-binding quotes from multiple dealers. To make this platform viable, Tradeweb relied on dealers to direct trading volume to its platform, and, to that end,

Tradeweb contracted with dealers from 2004 through 2007 to ensure sufficient liquidity for its IRS trading platform.

90.      At the time that Thomson Reuters acquired the company, Tradeweb saw itself as the leader in dealer-to-customer electronic trade execution, and it believed that the Thomson Reuters acquisition would allow Tradeweb to further develop its on-line trading platform to include real-time trade executions capabilities. Tradeweb also hoped to reach a greater level of scale, service and efficiency in the marketplace. These developments would allow Tradeweb to shift its RFQ platform closer to a real-time, anonymous exchange trading platform.

91.      Rather than allow the Tradeweb RFQ platform to evolve into a full-blown, real-time IRS trading exchange for the buy-side participants, the Dealer Defendants acted to exercise control over Tradeweb. In 2007, as a number of agreements that Tradeweb relied upon to ensure sufficient liquidity for its IRS trading platform expired, Tradeweb realized that large IRS dealers, like the Dealer Defendants, might "shop around" to steer liquidity for IRS trading to another platform.

92.      The Dealer Defendants seized upon this opportunity, via a plan known as "Project Fusion," to acquire a minority stake in Tradeweb. Eight Dealer Defendants invested in Tradeweb: Credit Suisse, Deutsche Bank, Goldman Sachs, Merrill Lynch, JP Morgan, RBS and UBS. By acquiring an equity stake in Tradeweb, the Dealer Defendants obtained the right to govern Tradeweb, which allowed them to ensure that Tradeweb would not convert its platform to an anonymous, CLOB-like exchange trading platform.

93.      The Dealer Defendants (except BNPP) soon filled Tradeweb's Board of Directors and governance committees with their current and former employees. For example, Lee Olesky, Tradeweb's past and current CEO, was the former Chief Operating Officer for Fixed Income at

Credit Suisse. As noted above (at ¶ 74), in 2008, Vic Simone, a Managing Director at Goldman Sachs and the former head of Goldman Sachs' PSI Group, served as the Chairman of Tradeweb's board of directors. He was succeeded by Brad Levy, who was also a member of Goldman Sachs' PSI Group. Notably, this meant that two former Goldman Sachs employees who were responsible for strategic development of Goldman Sachs' IRS trading (among other responsibilities) were now managing an IRS trading platform. Through such positions, Messrs. Simone and Levy and other representatives of the Dealer Defendants could regularly meet and collaborate with their direct competitors under the auspices of Tradeweb board meetings.

94.     Indeed, the Dealer Defendants dominate Tradeweb's board of directors. Tradeweb's board consists of two Tradeweb officers (Lee Olesky, Tradeweb's CEO, and Billy Hult, Tradeweb's President), two Thomson Reuters employees, and one representative from each of Tradeweb's shareholder banks (*i.e.*, each of the Dealer Defendants except BNPP). Because they hold the majority vote on the board, the Dealer Defendants are able to collectively block any decision by Tradeweb that undermines their interests with respect to buy-side URS trading activities.

95.     Additionally, the Dealer Defendants can also participate in Tradeweb's governance committees, which offers Dealer Defendants another method by which to control Tradeweb's IRS trading platform. Tradeweb keeps these committees and the identities of their members hidden from the public.

96.     Many of the Dealer Defendants met regularly under the cover of Tradeweb's board and governance committees. Such meetings include regular conference calls (which were often held on a weekly basis), and annual in-person board meetings. The Dealer Defendants used

these meetings to discuss and coordinate their strategy and to further their conspiracy to control the IRS market.

97.    When Tradeweb announced the minority interest stake acquired by the investing dealers, it promoted the idea that its IRS platform would offer its buy-side clients various advantages, such as accurate pricing information and greater market transparency. But Tradeweb did not offer an "all-to-all" anonymous trading platform for buy-side participants. After the Dealer Defendants' investment in and control over the company, Tradeweb continued to facilitate only dealer-to-client RFQ trading, without a CLOB or the opportunity for buy-side participants to trade with each other, as they would on an exchange-like platform. Without the development of an exchange (or SEF) via Tradeweb's trading platform and services, the Dealer Defendants could continue (and did continue) to extract the supracompetitive profits on dealer-to-client trades as they had historically realized with the earlier OTC market structure.

### 2.    The Dealer Defendants Used Their Market Dominance And Control Over Tradeweb To Constrain ICAP From Offering A Buy-Side IRS Exchange Platform

98.    As mentioned above (*see* Part I.B *supra*), dealer-to-dealer IRS trading is managed via interdealer broker platforms, generally referred to as IDBs. By the mid-2000s, as the IRS market began to consider offering all-to-all IRS trading platforms to the buy-side market, many IDBs found that they already operated such platforms in the interdealer market such that there would be few technological burdens to move these platforms into the buy-side space as well. Since IDBs profit from fees on each trade on their platforms, they had strong financial incentives to expand their services and platforms to buy-side participants.

99.    The Dealer Defendants acted to ensure that IDBs did not expand their services and platforms to buy-side trading. As early as 2007, the Dealer Defendants leveraged their market dominance to reach agreements with IDBs where the Dealer Defendants committed to

effecting IRS transactions between themselves using the IDB platforms and, in return for this reliable revenue stream, the IDBs would preclude buy-side participants from trading IRS on the IDB platforms.

100.    One aspect of this arrangement between the Dealer Defendants and the IDBs was that the Dealer Defendants would act to prevent any buy-side platforms from expanding into the interdealer space of the IRS market.

101.    One example of this conduct occurred when, in April 2009, Tradeweb decided to enter into the mortgage bond market. At this time, Tradeweb introduced a trading platform through a division known as DealerWeb, which was designed to service the IDB, or dealer-to-dealer trading market in the mortgage bond market. When DealerWeb, which was controlled by the Dealer Defendants through their control of Tradeweb, entered the mortgage bond market it caused Defendant ICAP, which also operated as an IDB, to lose approximately 85% of its mortgage bond business.

102.    For ICAP, this move by Tradeweb into the mortgage bond-IDB market space raised the specter that Tradeweb would make a similar move into the IRS-IDB market space.

103.    When DealerWeb entered the mortgage bond market, ICAP was developing i-Swap, which was an electronic trading platform for the European IDB IRS market. ICAP could easily bring its i-Swap platform to the U.S. market for IRS trading and open its electronic trading platform to buy-side IRS participants in the U.S.

104.    The Dealer Defendants acted to prevent ICAP from offering its electronic trading platform to the U.S. buy-side market. The Dealer Defendants, through Tradeweb, agreed that DealerWeb would not expand further into the IDB trading space, while ICAP would not introduce an all-to-all anonymous IRS trading platform to IRS buy-side participants.

105.    In effect, the Dealer Defendants used the economic leverage they possessed via their control of Tradeweb to reach an agreement with Defendant ICAP to preclude the introduction of a buy-side electronic exchange platform in the U.S. IRS market. Further, the Dealer Defendants were able to broker and maintain this arrangement because they maintain close relationships with ICAP's CEO, Michael Spencer.

106.    Consistent with this understanding among Defendants, in February 2013, ICAP expanded i-Swap to the United States, but limited participation to dealers. The Dealer Defendants supported i-Swap by directing their business to it, which helped to ensure ICAP had no need to launch an all-to-all, anonymous exchange trading platform for buy-side IRS participants.

107.    Absent Defendants' conspiracy, the arrangement with ICAP would not have occurred because it was in the individual economic self-interest of Tradeweb to grow and expand its DealerWeb service, and it was in the economic self-interest of ICAP to port its i-Swap service to the U.S. market where it could be used for buy-side exchange trading of IRS.

### 3.    The Dealer Defendants Boycott Javelin

108.    When an IDB eschewed reaching an agreement with the Dealer Defendants to offer the buy-side IRS participants access to the IDB's trading platform, the Dealer Defendants would boycott the IDB.

109.    One such incidence of this type of boycott occurred when, in 2011, a company called Javelin began developing an "all-to-all," anonymous exchange-like IRS trading platform that could be used by buy-side participants. One aspect of Javelin's plan was to offer firm pricing rather than the typical tentative quotes that required subsequent direct communications with the dealer before finalizing an IRS trade, which was the practice with OTC/RFQ retail IRS trading.

Initially, Javelin secured support from a group of buy-side entities, along with a number of second-tier dealers and RBS. By 2013, Javelin was preparing to launch its platform.

110.    The Dealer Defendants acted to prevent Javelin from offering an anonymous, electronic trading platform to the buy-side IRS market. The Dealer Defendants agreed not to provide the liquidity Javelin required to provide IRS trading, and the Dealer Defendants pressured their own buy-side IRS customers not to use Javelin's platform. RBS and the other second-tier dealers that had informally committed to provide liquidity to Javelin withdrew their support.

111.    As a result of the Dealer Defendants' boycott, Javelin today effectively has no revenues and facilitates no IRS trading.

### 4.    The Dealer Defendants Boycott TrueEX

112.    In 2013, a company called TrueEX attempted to introduce a vertically integrated IRS exchange-like trading platform and clearinghouse that would be accessible by buy-side participants.

113.    TrueEX was founded by a pioneer in the derivatives industry, Sunil Hirani, who had earlier co-founded an influential electronic trading platform for Credit Default Swaps (or "CDS"). TrueEX was initiated to spur a similar evolution for the electronic trading of IRS.

114.    TrueEX was the first IRS exchange to be approved by the CFTC following the Dodd-Frank Act. TrueEX would offer an opportunity for IRS trading without the traditional OTC/RFQ practice of privately negotiating the final price of the IRS trade over the phone. The platform would also include anonymous trading, which would encourage smaller players than the Dealer Defendants to enter as market-makers for IRS and otherwise promote increased competition, reduced prices and a decrease in the risk of IRS trading.

115.    TrueEX attracted attention from the buy-side market with as many as 62 buy-side participants agreeing to sign-up for the forthcoming platform, reflecting a clear interest by buy-side market participants for a genuine exchange-like IRS platform.

116.    Again, the Dealer Defendants collectively blocked TrueEX from becoming a successful exchange-like trading platform for IRS as many of the top dealer market-makers declined to use the TrueEX platform, effectively rendering it useless.

117.    Today, TrueEX, like Javelin, facilitates few trades in the IRS market. In fact, the majority of the IRS trades that are executed via TrueEX occur on its RFQ platform, which also lacks an anonymous trading feature. Further, most of those trades are "compression" trades, which is a form of trading that is designed to consolidate multiple offsetting contracts into a single position as a mechanism to simplify a firm's trading portfolio by reducing the overall number of trades. These compression trades do not include a bid/ask spread, and therefore, such trading does not impact the bid/ask spread of the Dealer Defendants' retail IRS trading.

118.    The net result of TrueEX's inability to launch a buy-side exchange-like IRS platform is that the Dealer Defendants have successfully prevented TrueEX from becoming a competitive threat to their retail IRS business.

**5.    The Dealer Defendants Boycott TeraExchange**

119.    In another example, a company called TeraExchange developed an anonymous order book (*i.e.*, a CLOB) for several asset classes, including IRS. As part of the process of developing an exchange-like trading platform for IRS, TeraExchange worked with the Chicago Mercantile Exchange ("CME"), an established clearinghouse, to develop a portfolio margining system that would offer retail IRS participants an accessible mechanism to calculate and post collateral for IRS trades. These efforts involved a large investment of millions of dollars by TeraExchange to prepare its IRS trading platform.

120.    Like TrueEX, TeraExchange attracted buy-side IRS participants to commit to trading on the platform it was developing. A number of these entities participated in a successful test of the TeraExchange IRS platform technology. Some of the Dealer Defendants, including Goldman Sachs, voiced initial support for TeraExchange's CLOB.

121.    In 2013, two buy-side entities completed the first trade using TeraExchange's IRS CLOB platform, which was cleared through the CME's clearinghouse by BNP Paribas Securities Corp., a BNPP clearing affiliate. BNPP's clearing office subsequently notified its execution office of this buy-side IRS trade. The execution office threatened the trading buy-side entities with a loss of access to clearing and other banking services, including execution services in other asset classes and general market research, if these entities continued to use TeraExchange's IRS trading platform.

122.    On or about the same time, Bank of America similarly threatened other buy-side firms that they would incur inflated clearing fees and liquidity boycotts if these buy-side entities used TeraExchange's CLOB to trade or make markets for IRS.

123.    Following these threats, few if any buy-side IRS participants have traded on TeraExchange's platform. And, shortly thereafter, the Dealer Defendants refused to use TeraExchange's IRS CLOB platform for trading or otherwise provide any IRS-related liquidity for this platform.

124.    In February 2015, TeraExchange announced that it would leave the IRS market, instead shifting its energies to bitcoin derivatives.

125.    Absent the Dealer Defendants' coordinated conduct, including their boycott of TeraExchange, buy-side IRS participants could have continued to trade and make markets for IRS using TeraExchange's platform.

\*             \*             \*

126.    The Dealer Defendants' collective conduct, including their boycotts of emerging buy-side SEF platforms, has enabled Defendants to reduce competitive pressures and continue to dominate the retail IRS market. The Dealer Defendants continue to impose high spreads in the retail IRS market, enabling them to impose supracompetitive prices for retail IRS trades, and co-Defendants Tradeweb and ICAP receive the vast majority of retail IRS trading and the higher revenues generated from such increased trading volume.

127.    The Dealer Defendants direct liquidity to RFQ-based SEFs, in particular co-Defendants Tradeweb and ICAP, that help maintain the bifurcated trading structure of the IRS market, where dealer-to-dealer trades uses anonymous, real-time IDB trading platforms and the retail side continues to use OTC/RFQ platforms that are not anonymous and that require follow-up calls (or Bloomberg chat communications) to obtain final prices before completing a trade.

128.    These Dealer Defendant-friendly platforms receive the vast majority of the trading volume of the Dealer Defendants. Indeed, ICAP now operates the dominant SEF, with approximately 50% of SEF-based trades taking place on its platform. Tradeweb also benefited from its active role in the conspiracy with its percentage of dealer-to-client IRS trades increasing from 23% to 45% since January of 2014.

C.    **The Dealer Defendants Threaten To Cut Off Clearing Services For Buy-Side Firms Who Try To Make Markets On Swap Execution Facilities**

129.    Another aspect of the Dealer Defendants' collective conduct to dominate and control the retail IRS market involves clearing services and fees associated with IRS trading.

130.    A clearinghouse operates to facilitate trading by acting as the trading partner for both counterparties to a trade—in essence, the two counterparties trade with the clearinghouse rather than directly with each other. A clearinghouse reduces the risk of trading by ensuring that

payments associated with a trade are still made when one counterparty defaults. To do this, a clearinghouse requires its members to contribute a large amount of capital to the clearinghouse's default fund to ensure the clearinghouse has the ability to meet the obligations of the defaulting counterparty.

131.    Because buy-side IRS participants normally cannot afford the fees and other requirements necessary to be a member of a clearinghouse, these buy-side participants rely on Futures Commission Merchants (or "FCMs") that are registered with the CFTC to manage trading accounts and clear IRS trades.

132.    Many of the FCMs are operated by the Dealer Defendants, who have the necessary capital to pay the clearinghouse fees and meet the membership requirements. Normally, this business relationship can be mutually beneficial where the FCM earns fees for clearing the IRS trades, and the buy-side participants can engage in IRS trading without the obligations necessary to become a clearinghouse member.

133.    Through their operation and control of their respective FCMs, the Dealer Defendants took actions to maintain the conspiracy to dominate and control the retail IRS trading market and preserve the Dealer Defendants' ability to supracompetitive prices for IRS. These actions include threatening to withdraw or refusing to provide clearing services to buy-side participants who wish to use rival trading platforms, increasing clearing fees as a punitive mechanism and either boycotting or taking control of clearinghouses that sought to facilitate electronic anonymous buy-side IRS trading.

134.    One such example occurred in connection with the proposed TeraExchange platform (discussed at Part II.B.5 *supra*), where the Dealer Defendants used their FCMs' control of clearing services to eliminate TeraExchange from the IRS market. In this instance, the FCM-

arm of certain Dealer Defendants provided an opportunity to view the details of buy-side clients'
IRS trades to alert the Dealer Defendants to trades conducted solely between buy-side
participants which trading activity threatens the Dealer Defendants control of the retail IRS
market.

135.    Indeed, the Dealer Defendants are able to use their FCMs to assist with
coordinating their collusive efforts in the retail IRS market because, *inter alia*, their FCM
clearing operations communicate regularly with their counterparts at the other Dealer
Defendants. For example, Piers Murray, the Global Head of Fixed Income Prime Brokerage at
Deutsche Bank, used to work as the Global Head of Rates Clearing at JP Morgan. Mr. Murray
communicates with his counterparts at other Dealer Defendants, such as Robert Burke, Co-Head
of Bank of America's Global Futures and Derivatives Clearing Services.

136.    Because using a clearinghouse for IRS trading activity serves a critical risk-
mitigation function, as well as the fact that clearing for certain IRS is mandated by law, an
FCM's refusal to offer clearing services or to impose onerous clearing fees can deter or outright
prevent buy-side participant from trading IRS. The risk that an FCM might act to punish a buy-
side participant in this manner exerts a powerful chilling effect on many buy-side entities in the
IRS retail market who might wish to trade IRS on platforms that represent a competitive
challenge to the Dealer Defendants' dominance and control in the retail IRS market.

137.    In a competitive market, the FCMs operated by the Dealer Defendants would
compete with each other to provide clearing services to buy-side IRS traders. If one FCM raised
its clearing fees or precluded a buy-side entity from IRS trading, then other FCMs would
compete to attract that buy-side entity's business. Instead, the FCMs operated by Bank of
America, Barclays, BNPP, Credit Suisse, JP Morgan and others have acted collectively to raise

clearing fees for certain buy-side members who engaged in retail IRS trading involving rival IRS trading platforms that the Dealer Defendants viewed as a competitive threat.

138.    For example, in July 2015, certain FCMs of the Dealer Defendants, including those of Barclays, BNPP, Credit Suisse and JP Morgan, punished certain IRS buy-side entities for perceived transgressions by increasing their clearing fees as much as ten times, while other buy-side entities remained protected from this hike in clearing fees.

139.    Absent collusion among the Dealer Defendants, their respective FCM operations would not act in concert to target the same buy-side firms with higher clearing fees, while maintaining uniform lower fees for other buy-side IRS market participants.

140.    In addition to employing punitive measures involving clearing fees and services, the Dealer Defendants have also acted to boycott or take control of clearinghouses that sought to facilitate electronic anonymous buy-side IRS trading.

### 1.    The Dealer Defendants Boycott Swapstream

141.    The Chicago Mercantile Exchange ("CME") operates one of the largest clearinghouses in the world.

142.    On July 24, 2006, CME acquired Swapstream, a London based multilateral electronic trading platform for IRS denominated in certain European currencies. CME planned to expand the scope of Swapstream's platform to include IRS denominated in the U.S. dollar beginning in the first quarter of 2008.

143.    In July 2007, CME also publicly announced that it planned to offer an anonymous "all-to-all" IRS trading platform. CME viewed its development of Swapstream as the first IRS trading platform to offer the retail IRS market a trading platform that provided the full benefits associated with central counterparty clearing services. In essence, the Swapstream service would leverage CME's expertise with its OTC clearing services.

144.    CME's announcements drew interest from buy-side IRS participants, and by February 2008, at least thirty-three buy-side participants committed to an Early Adopter Program for CME IRS services using Swapstream. These entities included banks, mortgage banks, asset managers, hedge funds and proprietary trading firms.

145.    The Dealer Defendants, as part of their conspiracy to extinguish any threats from clearinghouses and other IRS trading platforms, collectively boycotted Swapstream. Instead of clearing their IRS trading activity through CME, the Dealer Defendants committed to clear IRS transactions with other clearinghouse, including LCH.Clearnet, which, as discussed in the next section, the Dealer Defendants controlled. Lacking support due to the Dealer Defendants refusal to engage with Swapstream, the platform never launched.

146.    As a result of the Dealer Defendants' concerted action and refusal to deal with Swapstream, among other conduct alleged herein, the Dealer Defendants again successfully blocked the introduction of an anonymous, all-to-all IRS trading platform accessible to buy-side participants—in this instance, depriving them of the benefits associated with a powerful clearinghouse such as CME.

> **2.    The Dealer Defendants Acquire Control Over LCH.Clearnet To Ensure The Clearinghouse Did Not Offer Exchange Trading To The Retail IRS Market**

147.    Numerous IRS trades are cleared by SwapClear, which is a U.S. clearinghouse operated by the largest European clearing entity, LCH.Clearnet.

148.    LCH.Clearnet was traditionally an "execution neutral" clearinghouse. It cleared trades submitted by exchanges, swap dealers or any other execution platforms. It did not offer an IRS trading platform, such as that operated by Defendants Tradeweb and ICAP.

149.    LCH.Clearnet encountered financial difficulties in the fall of 2008. These difficulties made the clearinghouse vulnerable to acquisition or takeover by another entity.

150.    One such prospective purchaser was the Depository Trust & Clearing Corporation ("DTCC"). Through its subsidiaries, DTCC provides clearing, settlement and information services in equities, corporate and municipal bonds, unit investment trusts, government and mortgage-backed securities, money market instruments, and OTC derivatives.

151.    On October 22, 2008, DTCC announced it had made a bid to purchase LCH.Clearnet, and the two companies entered into a preliminary agreement to pursue a merger.

152.    DTCC's possible acquisition of the LCH.Clearnet clearinghouse presented a potential threat to the Dealer Defendants' control of the IRS retail market. The acquisition would allow DTC to vertically integrate the SwapClear clearinghouse services with its own trading services. This combination of DTCC's financial service assets with a clearinghouse could lead to a form of "one-stop" shopping for IRS as buy-side participants could obtain exchange trading, clearing, trade processing and record-keeping from a single entity.

153.    To thwart this potential source of competition to their control of the IRS retail market, Defendants cooperated on a collective project that they codenamed "Project Lily." They formed a consortium that included Defendants Goldman Sachs, Deutsche Bank, Credit Suisse, Barclays, JP Morgan, RBS and ICAP. This consortium announced on November 20, 2008 that it would offer to purchase LCH.Clearnet, planning to make the offer in or about May 2009.

154.    Around April 2009, DTCC aborted its efforts to acquire LCH.Clearnet.

155.    LCH.Clearnet then pursued a share buy-back plan (codenamed "Valkyrie") that was designed to streamline its list of shareholders. The plan would allocate a greater proportion of the company's shares to large users of LCH.Clearnet services, including, in particular, the Dealer Defendants. This plan was announced in September 2009.

156.    The effect of LCH.Clearnet's share buy-back plan was to transfer greater control over LCH.Clearnet to the Dealer Defendants. The buy-back plan was finalized by November 2009, with the result that the largest users of LCH.Clearnet, including the Dealer Defendants, owned an aggregate of 63% of the company's shares. In effect, LCH.Clearnet became an almost entirely dealer-owned clearinghouse.

157.    With the advent of the share buy-back plan, the Defendants' consortium, formed as part of Project Lily, was no longer necessary, and the Defendants did not purchase LCH.Clearnet.

158.    The ability of the Dealer Defendants to control LCH.Clearnet in order to prevent it from offering an exchange-like IRS trading platform is also reflected in a deal brokered in 2011 involving the London Stock Exchange.

159.    In September 2011, this exchange entered into negotiations with LCH.Clearnet about a possible takeover. A deal, ultimately finalized in 2013, included as a condition of the takeover that LCH.Clearnet would not vertically integrate into an exchange platform.

160.    The Dealer Defendants continue to exercise control over LCH.Clearnet and SwapClear. The following employees of the Dealer Defendants currently sit on LCH.Clearnet's board of directors, and allow the Dealer Defendants to exercise control over LCH.Clearnet's day-to-day activities: Mike Bagguley (Barclays Capital), Laurent Curtat (Credit Suisse), Jacques d'Estais (BNPP), Ashok Krishnan (Bank of America), and Denise Wyllie (Goldman Sachs).

161.    Through their collusive conduct, Defendants ensured that the Dealer Defendants would remain free to clear IRS trades through LCH.Clearnet without the risk that the clearinghouse would offer a competitive trading platform that integrated with its clearing services.

     **D.**     **The Dealer Defendants Police The Retail IRS Market Using A Practice Referred To As "Name Give-Up"**

162.     The Dealer Defendants maintain their control over the retail IRS market, in part, through the use of a policing mechanism known as "name give-up."

163.     Name give-up refers to a practice where the names of each counterparty to an IRS trade are made known to the other counterparty.

164.     Name give-up provides the Dealer Defendants with a policing tool because it alerts them to what trades a buy-side participant is pursuing. For example, this identifying mechanism will let a Dealer Defendant know when a buy-side participant is attempting to trade IRS on a dealer-only IDB platform. Because the Dealer Defendants are the primary liquidity providers in the IRS market, they are counterparties in many trades and, with the name give-up mechanism, they are able to identify any buy-side entity trading on a platform, especially an IDB platform.

165.     The name give-up mechanism also reveals buy-side participants' trading positions, which reflect that entity's trading strategies, to both dealers and other end users. Many buy-side participants do not want to reveal any aspect of their trading strategy to prevent other parties, including the Dealer Defendants, from exploiting that knowledge to the detriment of the buy-side entity's interests. Unsurprisingly, most buy-side entities go to great lengths to keep their trading strategies confidential.

166.     There is no reasonable basis for name give-up mechanisms in the IRS market due to, in part, the availability of central clearing services. Prior to the wide use of clearinghouses, a swap participant needed to know the identity of its counterparty to assess the risk that the counterparty might default on its obligations. Clearinghouses eliminate this concern because, as

discussed above (*see* ¶ 130 *supra*), the clearinghouse manages the risk of default by a counterparty. Clearinghouses effectively render the name give-up mechanism superfluous.

167.    Eliminating the name give-up mechanism would greatly facilitate the availability of anonymous, all-to-all trading in the IRS market.

168.    The Dealer Defendants require name give-up in connection with buy-side participants' use of IRS trading platforms to police any attempts by buy-side participants to use IDB platforms and to reduce or eliminate the chance that all-to-all, exchange-like IRS trading platforms would succeed in the IRS market. Any trading platform that does not mandate name give-up for trades on its IRS platform risked a boycott and/or other punishment from the Dealer Defendants. For example, a platform eschewing the name give-up mechanism may find that the Dealer Defendants simply move their IRS trading business to another platform, thereby depriving the offending platform of liquidity essential for IRS trading.

169.    As discussed above (at Parts II.B.3-5 *supra*), the attempts by Javelin, TrueEX and TeraExchange to offer exchange-like IRS trading without name give-up is one (major) reason why the Dealer Defendants worked collectively to neutralize or negate these platforms as a competitive market alternative for IRS trades.

170.    Defendants also threatened buy-side entities that showed support for anonymous all-to-all platforms. When, for instance, one buy-side firm attempted to trade IRS on an electronic platform, it received a phone call from a Dealer Defendant demanding to know why the buy-side firm had attempted the anonymous trade instead of trading directly with the Dealer Defendant.

171.    The Dealer Defendants also ensure the continuing use of the name give-up mechanism via an entity called MarkitSERV, which is a trade processing service for IRS and

other asset classes. MarkitSERV contributes to the IRS trade process by delivering the IRS

trades to clearinghouses once the trades are executed by the counterparties. The Dealer

Defendants require IDBs to send trades to MarkitSERV before they are cleared, notwithstanding

that it is possible to create a "straight-through" processing feature where the executed IRS trade

is delivered directly to the clearinghouse. MarkitSERV intercedes in the transaction process to

offer the IRS counterparties an opportunity to review the now-executed trade, which, in turn,

reveals the identities of the counterparties. This added step to the IRS trade process also affords

the counterparties an opportunity to terminate the executed trade.

172.    The IDBs use this MarkitSERV service because the Dealer Defendants collectively

require that they do so. IDBs use MarkitSERV despite the fact that buy-side entities complain that

the only function of the MarkitSERV service is to discourage non-banks from trading on IDB

platforms and to preserve the traditional IRS market structure where the dealer-to-client and

interdealer markets are separate, which benefits the Dealer Defendants.

173.    Due to the collective pressure from the Dealer Defendants, numerous SEFs have

imposed name give-up on their platforms, including the largest interdealer SEFs: BGC,

DealerWeb, GFI, ICAP, IGDL, Tullet Prebon, and Tradition.

174.    With the name give-up mechanism in place on SEF order book (CLOB)

platforms, buy-side entities are relegated to trading IRS on dealer-to-client RFQ platforms, which

typically offer worse prices.

## III.    DEFENDANTS' CONSPIRACY HARMED THE INTEREST RATE SWAPS MARKET

175.    Defendants' conspiracy has negatively impacted the IRS market and it has

deterred entry into the IRS market of any exchange-like, anonymous trading platform that would

provide increased price transparency and competition to the buy-side market, even after the passage of the Dodd-Frank Act.

A.    **Defendants' Conspiracy Has Negatively Impacted The Market**

176.    The Dealer Defendants colluded, in part, to create an artificial bifurcation of the IRS market between a "wholesale" dealer side of the market, which provides anonymous, real-time trading between dealers, and a "retail" end user side of the market, where buy-side participants must use OTC/RFQ platforms. While the interdealer IRS market enjoys the benefits of exchange-like trading platforms, including the lower spreads associated with such trading, the Dealer Defendants acted to relegate the buy-side to the functional equivalent of OTC, ensuring that the Dealer Defendants would continue to reap supracompetitive profits from artificially inflated spreads.

177.    The Dealer Defendants understood that all-to-all anonymous trading of IRS for buy-side participants would lead to a tightening of bid/ask spreads due to direct price competition among more entities. The Dealer Defendants risked lower profits from reduced spreads.

178.    Further, all-to-all anonymous exchange-like trading would also encourage alternative providers of liquidity to enter the IRS market and compete against traditional market-makers, such as the Dealer Defendants. This competition would also reduce spreads and lower Dealer Defendants' profits.

179.    The introduction of exchange-like platforms, or features, in the IRS market would likely have led to a significant tightening of bid/ask spreads paid by the buy-side. Similar introductions of exchange-like platforms in other markets, such as trading in equity options and foreign currencies, have created increased competition and reduced spreads.

180.    But for Defendants' anticompetitive conduct, Plaintiff and the members of the proposed Class would have traded IRS on electronic platforms, with far greater transparency and substantially reduced bid/ask spreads than they experienced with the OTC/RFQ trading platforms controlled by the Dealer Defendants.

181.    Bid/ask spreads did not meaningfully tighten even as SEFs entered the market in 2014, and these spreads remain inflated today, despite the passage of the Dodd-Frank Act.

182.    The Dealer Defendants' collusive conduct has resulted in SEFs becoming controlled by the Dealer Defendants (Tradeweb), entering into an agreement or understanding where the SEF does not compete with the Dealer Defendants, or otherwise disrupting the artificial division between the whole and retail sides of the IRS market (ICAP). The SEFs avoid risking retaliation or boycott by the Dealer Defendants by providing an RFQ platform.

183.    Defendants' collusion allows the Dealer Defendants to trade amongst and between themselves using state-of-the art, electronic, exchange-like platforms where they enjoy efficient execution, price transparency and direct competition, while buy-side participants are restricted to RFQ platforms (the functional equivalent of the antiquated OTC market) where they must transact with dealers and operate at material price and informational disadvantages.

B.    **Defendants' Conspiracy Has Deterred Introduction Of Exchange-Like Trading For Buy-Side Participants In The IRS Market**

184.    Absent Defendants' conspiracy, exchange-like trading platforms offering anonymous, all-to-all trading to buy-side participant would have been introduced in the IRS market due, in large part, to the standardization of IRS products and the availability of clearinghouses. A variety of market participants, including IDBs, clearinghouses and SEFs,

would have developed such platforms in order to realize new revenue streams through increased volume and market share in IRS trading.

185.    Because Defendants conspired to maintain control of the retail IRS market, any SEF or other entity seeking to introduce a fully anonymous order book (CLOB) trading platform for buy-side participants would risk retaliation from the Dealer Defendants.

186.     It was also in the individual interest of Dealer Defendants to support exchange-like trading for buy-side participants. Absent a conspiracy, each Dealer Defendant could increase its own market share by providing a more favorable trading experience to the buy-side in the form of fully anonymous CLOB trading, as clients shifted more and more of their trades to the new trading platforms. An individual Dealer Defendant could also obtain an equity share in the new trading platform, allowing it to become a market leader and to share in the profits of the platform.

187.    Absent Defendants' conspiracy that punished buy-side participants from trading on exchange-like platforms or seeking to avoid Defendants' pervasive use of the name give-up mechanism, it would have been in the self-interest of buy-side members to support and use anonymous, all-to-all trading platforms that offered the opportunity to realize compressed bid/ask spreads (*i.e.*, lower IRs prices), and the opportunity to trade with market participants other than the dealers, as well helping to preserve the confidentiality of buy-side participants' IRS trading strategies.

188.    Defendants' conspiracy prevented these market developments that would have provided increased competition and transparency in the IRS market, which would have resulted in lower bid/ask spreads. Such increased competition would also have reduced the Dealer Defendants' domination and control over the IRS market.

189.    Defendants' collusive agreements concerning the IRS market are *per se* illegal agreements to thwart competition among horizontal competitors. The Dealer Defendants' collective refusals to deal with participants in the IRS market, such as Javelin, TrueEX and TeraExchange, among others, amounted to group boycotts that are illegal under the antitrust laws.

190.    The Dealer Defendants used their market power in the IRS market to create and enforce an artificial division between the interdealer trading and dealer-to-client trading. The effect of the Dealer Defendants' anticompetitive agreements (such as with each other, IDBs, clearinghouses and SEFs) and their collective refusals to deal with various entities was to maintain this artificially divided market structure where buy-side participants were limited to trading with dealers, and to deny buy-side participants access to the more efficient and cheaper interdealer trading platforms or other opportunities to trade through an exchange-like platform. Plaintiff and the members of the Class were harmed by these illegal acts because they were deprived of the opportunity to transact IRS at tighter bid/ask spreads, *i.e.*, to trade IRS at cheaper prices.

## EQUITABLE TOLLING DUE TO DEFENDANTS' CONCEALMENT

191.    Plaintiff and the Class did not discover and could not have discovered through the exercise of reasonable due diligence that they were injured by Defendants' conspiracy to prevent exchange-like trading in the IRS market, much less who caused that injury, until at the earliest March 2015, when CFTC Chairman Massad publicly stated that the dealers were forcing SEFs to maintain name give-up and when it became clear that Defendants had successfully blocked market entry by SEFs that were prepared to open their exchange-like platforms to the buy-side.

192.    By its very nature, Defendants' conspiracy to divide the IRS market and boycott IRS exchanges was self-concealing.

193.    Defendants implemented their conspiracy, in part, through meetings of the Tradeweb board of directors which were not open to the public. Defendants also used their positions in other industry consortia to meet regularly. These meetings provided a seemingly legitimate front for Defendants' conduct even though their discussions often had no valid connection to the legitimate work of the boards, committees, and other entities. Plaintiff and the Class had no reason to believe these meetings were being used by Defendants to execute a conspiracy to block the all-to-all trading of IRS.

194.    Defendants colluded in part through industry consortium efforts. These efforts are "top secret" and protected by non-disclosure agreements, making it nearly impossible for Plaintiff and the Class to learn of their conspiratorial nature.

195.    Defendants also regularly met in person, and communicated regarding their conspiracy via telephone, email, instant messaging, and Bloomberg messaging. Plaintiff and the Class had no way to access such communications.

196.    In addition, the nature of the IRS market kept Defendants' conspiracy concealed from the public. The OTC market is opaque and controlled by the Dealer Defendants. Market participants are fearful of retaliation by the Dealer Defendants. And Defendants' blocking of exchange trading has reduced price transparency, making it difficult for the public to compare IRS prices among competitors.

197.    It is telling that while certain government regulators have made comments criticizing Defendants' conduct, there have been no public investigations to date against Defendants for their conspiracy to preserve the OTC IRS market. Defendants' conduct has been so thoroughly concealed that it has, to this date, escaped the attention of the very regulators charged with keeping the IRS market transparent and competitive.

198.    Because Defendants employed acts and techniques that were calculated to conceal the existence of their conspiracy, Plaintiff and the Class could not have discovered the existence of this unlawful conduct any earlier than March 2015, when reports emerged that the Dealer Defendants were collectively refusing to trade on all-to-all anonymous SEFs. Even after this announcement, Plaintiff had to undertake substantial efforts and conduct an exhaustive factual investigation to piece together Defendants' conspiracy.

199.    Throughout the Class Period, Plaintiff and members of the Class regularly monitored news reports concerning the financial industry and the IRS market. Plaintiff and members of the Class undertook such activity in order to try to enter into IRS at good prices. Throughout the Class Period, Plaintiff and members of the Class also regularly monitored prices within the IRS market, to the extent such monitoring was possible. In particular, Plaintiff and members of the Class, directly or through their investment managers, regularly monitored available IRS pricing data through electronic databases and other sources including Bloomberg. Practically speaking, there were limits to what could be done, given that so much of the IRS market was shrouded in secrecy due to Defendants' conduct.

200.    Because of Defendants' concealment, any applicable statute of limitations affecting or limiting the rights of action by Plaintiff or members of the Class have been tolled during the period of concealment.

## CLASS ACTION ALLEGATIONS

201.    Plaintiff, on behalf of itself and those similarly situated, seeks damages against Defendants based on the allegations contained herein.

202.    Plaintiff brings this action on behalf of itself and, under Federal Rule of Civil Procedure 23(a) and (b)(3), as the representative of a Class defined as follows:

All persons or entities who, from January 1, 2008 to the present (the "Class Period") directly entered into fixed-for-floating interest rate swaps with the Dealer Defendants, or their respective affiliates, in the United States and its territories. Excluded from the Class are Defendants, their co-conspirators identified herein, and their officers, directors, management, employees, current subsidiaries or affiliates, and all federal governmental entities (the "Class").

203. *Numerosity.* Members of the Class are so numerous that joinder is impracticable. Plaintiff does not know the exact size of the Class, but believes that there are thousands of Class Members geographically dispersed throughout the United States.

204. *Typicality.* Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class were damaged by the same wrongful conduct of Defendants. Specifically, Defendants' wrongdoing caused Plaintiff and members of the Class to pay inflated fixed rates when they were on one side of a swap or receive unduly low fixed rates when there were on the other side of a swap.

205. Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiff are coincident with, and not antagonistic to, those of the Class. Accordingly, by proving its own claims, Plaintiff will prove other Class Members' claims as well.

206. *Adequacy of Representation.* Plaintiff is represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation. Plaintiff and its counsel have the necessary financial resources to adequately and vigorously litigate this class action. Plaintiff can and will fairly and adequately represent the interests of the Class and has no interests that are adverse to, conflict with, or are antagonistic to the interests of the Class.

207. *Commonality.* There are questions of law and fact common to the Class, which questions relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

      a.     Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to allocate the dealer-to-client IRS market and dealer-to-dealer IRS market between themselves, thereby inflating prices associated with the purchase and sale of IRS in the United States;

      b.     Whether the conduct of Defendants and their co-conspirators, as alleged, caused injury to the business and property of Plaintiff and other members of the Class;

      c.     The effect of Defendants' alleged conspiracy on the prices associated with the purchase and sale of IRS sold in the United States during the Class Period;

      d.     The appropriate measure of damages sustained by Plaintiff and other members of the Class;

      e.     Whether Plaintiff and other members of the Class are entitled to injunctive relief; and

      f.     The appropriate injunction needed to restore competition.

208.    ***Predominance.*** Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members of the Class because Defendants have acted on grounds generally applicable to the entire Class, thereby making a common methodology for determining class damages as a whole appropriate. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

209.    ***Superiority.*** Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated,

geographically dispersed persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.

210.    Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Conspiracy to Restrain Trade in Violation of Section 1 of the Sherman Act)**

211.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

212.    As alleged above, Defendants and their co-conspirators entered into and engaged in a horizontal contract, combination, or conspiracy in restraint of trade to (1) allocate the dealer-to-client IRS market and dealer-to-dealer IRS market between themselves, and (2) jointly boycott entities that would introduce competition on IRS bid/ask spreads in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Such contract, combination, or conspiracy constitutes a naked, *per se* violation of the federal antitrust laws and is, moreover, an unreasonable and unlawful restraint of trade that lacks any countervailing procompetitive rationale.

213.    Defendants and their co-conspirators' contract, combination, agreement, understanding, or concerted action was without procompetitive justification and occurred within the flow of, and substantially affected, interstate commerce.

214.    IRS are, and are widely perceived by those in the industry to be, a unique financial product. The market for the purchase and sale of IRS in the United States is treated as a distinct financial market by market participants, government actors, and in economic literature.

215.    Other derivative products are not substitutable for IRS. The rapid rise in IRS volume following their inception in the mid-1980s and the global financial crisis demonstrates that investors turned to IRS to secure the unique and critical function of protection against future movements in interest rates.

216.    The relevant geographic market is the United States. The Dealer Defendants, however, dominate more broadly defined geographic markets as well, including the global market.

217.    As a direct and proximate result of Defendants' scheme and concrete acts undertaken in furtherance thereof, competition in IRS trades between Defendants and their non-dealer customers has been severely curtailed. Plaintiff and the members of the Class have been injured and financially damaged in their respective businesses and property, in amounts that are presently undetermined. The damages to Plaintiff and the members of the Class are directly attributable to Defendants' conduct, which resulted in all members of the Class paying artificially inflated bid/ask spreads on every IRS they purchased or sold during the Class Period. Plaintiff's injuries consist of artificially inflated costs associated with the purchase and sale of IRS in the United States caused by Defendants' misconduct. Plaintiff's injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

## SECOND CAUSE OF ACTION
### (Unjust Enrichment)

218.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

219.    Because of the acts of Defendants and their co-conspirators as alleged herein, Defendants have been unjustly enriched at the expense of Plaintiff and the Class.

220.    Plaintiff and the Class seek restitution of the monies of which they were unfairly and improperly deprived, as described herein.

## PRAYER FOR RELIEF

221.    WHEREFORE, Plaintiff, on behalf of itself and the proposed Class of similarly situated entities, respectfully requests that the Court:

a.    Determine that this action may be maintained as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), direct that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class, and declare Plaintiff as the representative of the Class;

b.    Find Defendants jointly and severally liable for the damages incurred by Plaintiff and the Class;

c.    Award the Class treble damages;

d.    Award reasonable attorneys' fees and costs;

e.    Award all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity from the date of service of the initial complaint in this action;

f.      Decree that Defendants and their co-conspirators have unlawfully conspired to block the emergence of fully anonymous CLOB SEF trading of IRS in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

g.      Decree that Defendants have been unjustly enriched by their wrongful conduct and award restitution to Plaintiff and the Class;

h.      Permanently enjoin Defendants from continuing their unlawful conduct, which has prevented competition from entering the IRS market, a market valuable to not only Plaintiff and the members of the Class but to the nation's financial system and broader economy for the risk management and liquidity benefits it can provide; and

i.      Order such other, further, and general relief as is just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff, on behalf of itself and the

proposed Class, demand a trial by jury on all issues so triable.

DATED: July 1, 2016

**BERGER & MONTAGUE, P.C.**

*/s/ Merrill G. Davidoff*
Merrill G. Davidoff, Attorney #DM4099
Eric C. Cramer
Michael C. Dell'Angelo
David A. Langer
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3000
Fax: (215) 875-4604
mdavidoff@bm.net
ecramer@bm.net
mdellangelo@bm.net
dlanger@bm.net